**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

RECEIVED

2017 AUG -4 P 2: 35

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| **H. RENEE JAMES,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| **CITY OF MONTGOMERY; CITY OF** | ) |
| **MONTGOMERY POLICE DEPARTMENT;** | ) |
| **CITY OF MONTGOMERY PERSONNEL** | ) |
| **DEPARTMENT; CITY OF MONTGOMERY** | ) **CIVIL ACTION NO.** |
| **CITY INVESTIGATIONS; MAYOR TODD** | ) 2:17-CV-528-MHT-CSC |
| **STRANGE; DIRECTOR J. CHRISTOPHER** | ) |
| **MURPHY; CHIEF EARNEST FINLEY; DEPUTY** | ) |
| **CHIEF CHRISTOPHER A. WINGARD; FORMER** | ) |
| **DEPUTY CHIEF RON COOK; FORMER DEPUTY** | ) |
| **CHIEF BRIAN JURKOFSKY; FORMER DEPUTY** | ) |
| **CHIEF WILLIAM S. SIMMONS; LIEUTENANT** | ) |
| **NATASHA WALKER; SERGEANT BRUCE** | ) **JURY** |
| **THORNELL; CORPORAL DONALD LOWE;** | ) **DEMAND** |
| **DIRECTOR RONALD F. SAMS; CARMEN** | ) |
| **DOUGLAS; RUDY MARTINEZ; JOHN DOE;** | ) |
| **JOHN DOE in his/her individual Capacity** | ) |
| **and CITY OF MONTGOMERY.** | ) |
| | |
| **Defendants.** | |

---

## COMPLAINT

---

1.     Plaintiff's address and telephone number: <u>9607 Farnham Drive Pike Road, AL.</u>
<u>36064, (304)-873-6334.</u>

2.     Defendant(s)' name(s):

**City of Montgomery Mayor Todd Strange**, 103 N. Perry Street Montgomery, AL.
36104

**Director of Public Safety J. Christopher Murphy**, 103 N. Perry Street Montgomery,
AL. 36104

**Chief of Police Earnest Finley**, 320 N. Ripley Street Montgomery, AL. 36104

**Chief of Staff Christopher A. Wingard**, 320 N. Ripley Street Montgomery, AL. 36104

**Brian Jurkofsky**, 395 Magnolia Loop Millbrook, AL. 36054

**Ron Cook**, 2061 Short Line Drive Montgomery, AL. 36116

**William S. Simmons**, 3720 Henderson Place Millbrook, AL. 36054

**Lieutenant Natasha Walker**, 1751 Congressman Dickerson Drive Montgomery, AL. 36109

**Bruce Thornell**, 2781 Ashley Avenue Montgomery, AL. 36109

**Corporal Donald Lowe**, 320 N. Ripley Street Montgomery, AL. 36104

**Director of City Investigations Ronald F. Sams**, 300 Water Street Montgomery, AL. 36104

**City of Montgomery Human Resources Director Rudy Martinez** 27 Madison Avenue Montgomery, AL. 36104

**City of Montgomery Personnel Department, Carmen Douglas**, Personnel Director, 27 Madison Avenue, Montgomery, AL. 36104

3.      Place of alleged violation of civil rights: City of Montgomery, Alabama.

4.      Date of alleged violation of civil rights: September 2014-November 2015.

5.      The following are the stated facts on which are based on allegation that Plaintiff's constitutional rights have been violated:


          COMES NOW, the Plaintiff, H. Renee James ("James"), and files this complaint to be answered by the Defendant pursuant to the Federal Rules of Civil Procedure.

          **I.      JURISDICTION**

          1.      The jurisdiction of the Court is invoked pursuant to 28 U.S.C. 1343(3) (depravation of constitutional or federal statutory rights) and 28 U.S.C. 1331 (federal question).

          2.      The jurisdiction of the Court is invoked to secure protection of and redress deprivation of right secured by 42 U.S.C. 1981 providing for relief against racial discrimination, and retaliation.

          3.      The jurisdiction is further invoked by 42 U.S.C.1983 providing relief for violations of federal constitutional or statutory rights.

          4.      The jurisdiction is also invoked by 42 U.S.C. 2000(e) *et. Seq.*

5.     There are no statutory prerequisites to 42 U.S.C. 1981 or 42 U.S.C. 1983.

6.     The Plaintiff timely filed her Right to Sue against the City of Montgomery, City of Montgomery Police Department.

7.     The Plaintiff timely filed her suit within receipt of her Right to Sue letter against the City of Montgomery, City of Montgomery Police Department, et al.

8.     The City of Montgomery employs more than 500 people.

**II.     PARTIES**

9.     The Plaintiff, James, is over the age of nineteen, is a citizen of the United States and is a resident of the State of Alabama, within the Middle District of Alabama, Northern Division.

10.     The Plaintiff, James, is currently employed with the City of Montgomery, as a Patrol Sergeant.

11.     The defendant, the City of Montgomery, City of Montgomery Police Department, ("the City"), is an entity subject to suit under 42 U.S.C. 1981, is a person acting under the color of state law subject to suit under 42 U.S.C. 1983, and is located within the Middle District of Alabama, Northern Division.

12.     The defendant, Todd Strange ("Strange"), is over the age of nineteen, is a citizen of the United States, and is a resident of the State of Alabama, Northern District.

13.     The defendant, Strange, at all material times hereto, is employed with the City of Montgomery, as the City of Montgomery Mayor.

14.     The defendant, J. Christopher Murphy ("Murphy"), is over the age of nineteen, is a citizen of the United States, and is a resident of the State of Alabama, Northern District.

15.     The defendant, Murphy, at all material times hereto, is employed with the City of Montgomery, as the City of Montgomery Public Safety Director.

16.     The defendant, Earnest Finely Sr. ("Finley"), is over the age of nineteen, is a citizen of the United States, and is a resident of the State of Alabama, Northern District.

17.     The defendant, Finley, at all material times hereto, is employed with the City of Montgomery Police Department, as the Montgomery Police Department Chief of Police.

18.     The defendant, Christopher A. Wingard ("Wingard"), is over the age of nineteen, is a citizen of the United States, and is a resident of the State of Alabama, Northern District.

19.   The defendant, Wingard, at all material times hereto, is employed with the City of Montgomery Police Department, as the Montgomery Police Department Chief of Staff.

20.   The defendant, Ron Cook ("Cook"), is over the age of nineteen, is a citizen of the United States, and is a resident of the State of Alabama, Northern District.

21.   The defendant, Cook, at all material times hereto, was, at the time of the violation, employed with the City of Montgomery Police Department, as the Chief of Staff. Cook has since resigned.

22.   The defendant, Brian Jurkofsky ("Jurkofsky"), is over the age of nineteen, is a citizen of the United States, and is a resident of the State of Alabama, Northern District.

23.   The defendant, Jurkofsky, at all material times hereto, was, at the time of the violation, employed with the City of Montgomery Police Department, as the Chief of Staff. At the time of the violation, Jurkofsky was assigned to the Criminal Investigation Division (C.I.D.) as the Department Head. Jurkofsky has since retired.

24.   The defendant, William S. Simmons ("Simmons"), is over the age of nineteen, is a citizen of the United States, and is a resident of the State of Alabama, Northern District.

25.   The defendant, Simmons, at all material times hereto, was, at the time of the violation, employed with the City of Montgomery Police Department, as the Chief of Operations. Simons has since resigned.

26.   The defendant, Natasha Walker ("Walker"), is over the age of nineteen, is a citizen of the United States, and is a resident of the State of Alabama, Northern District.

27.   The defendant, Walker, at all material times hereto, is employed with the City of Montgomery Police Department, as a police Lieutenant.

28.   The defendant, Bruce Thornell ("Thornell"), is over the age of nineteen, is a citizen of the United States, and is a resident of the State of Alabama, Northern District.

29.   The defendant, Thornell, at all material times, hereto, was, at the time of the violation, employed with the City of Montgomery Police Department, as a Major Crimes Bureau Sergeant. Thornell has since retired.

30.   The defendant, Donald Lowe ("Lowe"), is over the age of nineteen, is a citizen of the United States, and is a resident of the State of Alabama, Northern District.

31.   The defendant, Lowe, at all material times, hereto, is employed with the City of Montgomery Police Department, as a police Corporal.

32.    The defendant, Ronald F. Sams ("Sams"), is over the age of nineteen, is a citizen of the United States, and is a resident of the State of Alabama, Northern District.

33.    The defendant, Sams, at all material times, hereto, is employed with the City of Montgomery, as the City Investigations Director.

34.    The defendant, Carmen Douglas ("Douglas"), is over the age of nineteen, is a citizen of the United States, and is a resident of the State of Alabama, Northern District.

35.    The defendant, Douglas, is employed with the City of Montgomery, as the City-County Personnel Director, has authority over the implementation and enforcement of personnel policies and procedures, including disciplinary matters, and employee grievances.

36.    The defendant, Rudy Martinez "(Martinez"), is over the age of nineteen, is a citizen of the United States, and is a resident of the State of Alabama, Northern District.

37.    The defendant, Martinez, is employed with the City of Montgomery, as the Human Resource Director.

### III.    FACTUAL ALLEGATIONS

38.    The City of Montgomery is a municipality, incorporated, organized and existing pursuant to the laws of the State of Alabama, and operates the City of Montgomery Mayor's Office, City of Montgomery Public Safety Office, City of Montgomery Police Department, City Investigations Office, City of Montgomery City-County Personnel Department, and the City of Montgomery Human Resources Department.

39.    James is an African-American female.

40.    James, is a fourteen-year veteran of the Montgomery Police Department, and at the time of the violation, was assigned to the Major Crimes Robbery/Homicide Bureau, as a Robbery Detective.

41.    James, while assigned to the Major Crimes Bureau, was the only African-American and only female detective assigned to the bureau.

42.    During Plaintiff's assignment to C.I.D., Plaintiff was disciplined far harsher than white investigators who had committed similar or far more egregious offenses.

43.    April 16, 2013, Plaintiff stopped and boarded a Montgomery County Public School bus after receiving a frantic call from her 17y/o daughter, who was occupying the bus at the time. Plaintiff's daughter explained that she had just been beaten up by a 17y/o male occupant on the bus, because he didn't want her sitting next to him. Mid-call, the phone was disconnected and after several calls to reconnect with

her daughter, Plaintiff was unable to make contact. While in uniform and driving an unmarked City issued vehicle, Plaintiff located the bus, removed the subject from the bus and detained him until Sheriff deputy's arrived. No further incident took place while boarding the bus or while taking the male subject into custody. Plaintiff's daughter had been badly beaten and received swelling and bruises about the face, due to being repeatedly punched, as well as a black eye and a busted lip. The fight that occurred between Plaintiff's daughter, as well as Plaintiff boarding and removing the male subject from bus was all captured on the bus' video surveillance. Sheriff deputies transported male subject to the Montgomery County Detention Facility, where Plaintiff charged him with misdemeanor Assault.

44.    Plaintiff notified her immediate supervisor at the time, Sergeant J. Hall ("Hall"), a white male, of incident immediately after receiving call from her daughter, at which time Hall was fully advised of all details thereafter. The following day after the incident, Plaintiff was immediately relieved of her duties, stripped of her uniform, weapon, badge, and immediately transferred from the Criminal Investigations Division, to the second shift back desk, and was not allowed access to her pending cases for nearly four months, pending completion of the investigation into the incident.

45.    On the day of the offense, Plaintiff contacted Hall, just after receiving the call from her daughter, after contact was made with the bus, after the male subject was transported to the youth facility, and the Plaintiff reiterated the entire incident with Hall in person when Plaintiff returned to the C.I.D. office. In each instance of contacting Hall, he was given full disclosure of the details regarding the arrest and all that it entailed. After all, the Plaintiff's interaction between her and the male subject was all captured on video.

46.    Hall failed to advise the C.I.D Command of the incident, and once the C.I.D. Command received the complaint the day after the offense from the Montgomery County Public School system (MPS) regarding Plaintiff boarding the school bus "without permission." The bus driver did not refuse Plaintiff access on to the bus and nor did she advised Plaintiff to vacate the bus once she boarded. In fact, the bus driver was heard on the bus video praising Plaintiff for removing the male subject from the bus. Hall was questioned by Jurkofsky as to why Hall did not notify the Command. Instead of being forthcoming about his failure to notify the Command, Hall lied, insisting that Plaintiff did not notify him on all the facts involving the arrest, so he didn't feel the incident was worthy of notification. After Plaintiff advised Jurkofsky that Hall's statement was untrue, and even after Plaintiff was able to produce her cell phone records that detailed the numerous calls she made to Hall that day, Jurkofsky still chose to believe Hall and charged Plaintiff with failure to notify, as well as a host of other charges. Jurkofsky advised Plaintiff that Plaintiff had no right to enter the school bus, because Plaintiff was "acting in the role of a parent and not as a police officer." And, that Plaintiff utilized "bad judgment, Plaintiff's acts were "immature, unprofessional, and emotionally driven."

47.    Jurkofsky charged Plaintiff with violating three (3) departmental policies regarding the said incident, to include: Wrongful Arrest, Improper use of City Equipment (using the vehicle's emergency lights to stop the school bus), and Duties to Responsible Employment.

48. Plaintiff was later charged with a fourth charge, which was not a departmental policy violation, but a State of Alabama Title 13 misdemeanor offense, of Obstruction of Governmental Operations (punishable by up to a year in jail), for simply boarding the school bus. Major Jurkofsky advised on several occasions, during and after the conclusion of the investigation that he "would've done the same thing or worse" had it been his child aboard the school bus. Jurkofsky made the statement in the company of various other detectives each time he uttered it. When Plaintiff asked what she had done wrong, Major Jurkofsky simply told her she had "went about handling the matter the wrong way." Jurkofsky would not elaborate on what he meant by that statement and could not advise Plaintiff on what she should have done differently to avoid punishment.

49. Although Jurkofsky repeatedly stated in the presence of other detectives that he would have acted in a similar manner or even acted erratically in the defense of his child, had he/she been aboard the bus instead, he still very harshly and punitively charged Plaintiff with various violations of departmental policies, and threatened with being arrested and placed in jail for simply protecting her own child.

50. Subsequent to the conclusion of the investigation, Jurkofsky suspended Plaintiff for a total of nineteen days without pay. Additionally, Plaintiff was also ordered to attend mandatory psychological counseling for "anger management." According to Jurkofsky, counseling was ordered due to the "emotionally driven" way in which Plaintiff handled the incident. Jurkofsky never mentioned that he thought Plaintiff appeared angry or displayed an angry demeanor at any time during the arrest of the male subject or thereafter. There was no witness testimony, nor did the surveillance footage indicate that Plaintiff expressed any anger towards the arrestee or anyone aboard the bus during or after the arrest.

51. Comparatively, on or about January 2015, two white male General Crimes detectives, Manning and Hogan, both Caucasian males, were accused of having used excessive force against a black male (punishable by up to life in prison), who turned out not to be the subject they believed him to initially be. The subject had been beaten so badly that he passed out and had nearly lost consciousness while at the C.I.D. The beating was so extreme that the subject's face and head had swollen profusely, he was bleeding about the face and was nearly unrecognizable. The incident was captured on an accompanying officer's patrol car camera.

52. The subject was not the murder suspect the detectives believed him to be, and nor did he commit any crime(s). Jurkofsky ordered an investigation by the City Investigations office. Due to the nature of the offense, Jurkofsky seized the detective's weapons.

53. However, Jurkofsky did not react in the same harsh manner as he did in Plaintiff's bus incident. Unlike Jurkofsky's handling of Plaintiff's incident, Jurkofsky did not remove the detectives from the C.I.D. to the back desk while the incident was under investigation, both detectives remained at the C.I.D. The two were not stripped of their uniforms and ordered to wear civilian clothing, they were allowed to wear their usual suit and

tie. Both detectives were allowed to continue to work on their cases, and allowed to maintain their status as detectives in an administrative capacity until the conclusion of the investigation.

54.    November 2, 2016 Walker stated that she investigated Hogan's excessive force case, and that during the interview, Hogan had initially lied about having made contact with the black male subject. However, Hogan later recanted and apologized for having lied in the interview. Hogan had confessed to hitting the black male in some way, but insisted that he was not the cause of the majority of the injuries. Hogan was not charged with an additional charge of Truthfulness at All Times (punishable by termination), but instead, according to Walker, Hogan's lies were "swept under the rug" even after Captain R. Harris notified Jurkofsky of the change in Hogan's statement. Jurkofsky did not order that the charges in Hogan's investigation be amended to reflect Truthfulness violations, after having lied in his interview. And, Hogan was not threatened with termination of employment, nor was he threatened with being jailed for excessive use of force.

55.    The City Investigators were not able to substantiate charges against Manning. His charges were deemed unfounded.

56.    The charge of Excessive Force against Hogan was substantiated and he received a three (3) day suspension. Although his charges were overtly violent in nature, and far more egregious and invasive, that that of the Plaintiff's, Hogan was not ordered to attend mandatory psychological counseling for anger management as an addition to his punishment.

57.    On or about 2013, Lieutenant Denise Barnes ("Barnes") [then Sergeant], an African American female, while at the time assigned to the C.I.D. as a General Crimes Sergeant, was disrespected by Detective M. Geier, a Caucasian male. Geier failed to arrive for work on one particular morning, and after various attempts to make contact with him by phone, he eventually answered. He immediately begun screaming at Barnes, even chastised her for calling him. Geier shouted and used profane language towards Barnes while also speaking to her in an overtly obscene and disrespectful tone. Geier ultimately terminated the phone call before Barnes had completed the conversation, hanging up on her while she was speaking.

58.    Barnes reported the incident to Lieutenant M. Mara ("Mara"), who insisted that Geier issue a simple "apology" for his behavior, as oppose to a written reprimand. Barnes' complaint was not taken seriously. Barnes had to press the issue with the C.I.D. Command in order to have charges brought against Geier for his behavior.

59.    After Barnes pressed the C.I.D. Command to punish Geier, Geier received a three (3) day suspension for his behavior. Geier was not ordered to seek mandatory psychological counseling for anger management as an addition to his punishment. Geier was promoted to the rank of Sergeant within a few months of this incident.

60.    While assigned to the Major Crimes Bureau, all eight (8) detectives collectively assigned to both the Robbery Bureau and Homicide Bureau, at that time,

were all white males.

61.     The Plaintiff was often shouted at and treated in a hostile manner by Thornell, a white male, whereas the white male detectives were not treated as harshly. Thornell would often begin his near daily unprovoked tirades with Plaintiff by referencing how she [Plaintiff] is just like his wife, and that we [women] are all the same. Plaintiff never once screamed or shouted at supervisor regardless as to how disrespectful and rude he treated her.

62.     Various requests to the C.I.D. Command, particularly to Captain C.J. Coughlin ("Coughlin"), a white male, and then Major Jurkofsky, a white male, from then black male, Homicide Bureau supervisor T.D. James, who openly expressed his requests for Plaintiff's transfer to the Homicide Bureau. He was not given an answer as to why Plaintiff's transfer was not considered.

63.     A total of nine (9) detectives collectively (to include Plaintiff) were assigned to both the Robbery Bureau and Homicide Bureau. Only two of those detectives were more experienced than she. Plaintiff had far more investigative experience (six years of Traffic Homicide experience) and longevity within the department; however, Plaintiff was not considered for the Homicide Bureau position even after personal requests were made to the Command from the Homicide Bureau supervisor, T. D. James, himself.

64.     Thornell insisted that Plaintiff was a "valuable asset" to the bureau and that she "worked relentlessly to bring justice to victim's cases....often times she can be found working past working hours" to investigate cases. Thornell also stated that Plaintiff "played a significant part" in the Robbery Bureau and that she displayed "professionalism through her daily work ethic." But, no consideration was made in transferring her to the Homicide Bureau.

65.     Soon after Sgt. James' requests for Plaintiff's transfer to the Homicide Bureau were ignored, Jurkofsky allowed rookie General Crimes detective white male, Corporal Mason Wells ("Wells") to shadow homicide investigators in order to incorporate Wells into the bureau after he was fully trained. At that time, Wells had been a General Crimes investigator for approximately six months.

66.     Friday, January 23, 2015, at approximately, Plaintiff met with Deputy Chief Cook in his office, at which time Plaintiff verbally complained of racially and sexually discriminatory acts against her for the Command's decision to transfer rookie detectives to the Homicide Bureau ahead of her. During the meeting, Cook made inappropriate and unprovoked sexual comments and seductive gestures. Plaintiff ignored Cook's advances and concluded the meeting. However, before the conclusion of the meeting, Cook promised he would discretely address the issues with Jurkofsky and ensured Plaintiff that he would rectify the complaints. At that time, Plaintiff did not make complaint to anyone regarding Cook's inappropriate behavior.

67     Shortly after meeting with Cook and after not accepting his sexual advances, Thornell's treatment towards Plaintiff became increasingly worse.

68.     February 5, 2015, less than two weeks after the meeting with Cook, Plaintiff contacted Cook on his City cellular phone, asking if he had contacted Jurkofsky yet in reference to her complaints of race/sex discrimination and hostility from supervision, because since their meeting, her treatment by supervision had become increasingly worse. Cook advised that he had not contacted anyone regarding their conversation.

69.     February 9, 2015, Thornell received a citizen complaint from Latonya Jackson, against Plaintiff. Jackson is the girlfriend of death row inmate Marquise Woodward. Woodward killed Montgomery Police Officer Keith Houts in 2006.

70.     According to Lieutenant N. Walker, Jackson had been coached by Thornell on how to file a formal complaint against Plaintiff at the City Investigations Office, which Jackson filed soon after making phone contact with Thornell.

71.     Jackson's complaint to City Investigations was that while her son, Mario Woodward, Marquise Woodward's son was in Plaintiff's custody at the C.I.D., Plaintiff called Mario's father a single expletive while in Mario's presence.

72.     After being informed that Thornell, according to Walker, "coached" Jackson on how and where to complain against Plaintiff, Plaintiff met with Thornell in his office regarding the complaint.

73.     Plaintiff contacted Corporal D. Lowe ("Lowe"), who had taken custody of Mario Woodward, and transported Mario to the C.I.D. on the day Plaintiff and Mario first met. Lowe introduced Mario as Marquise Woodward's son. Plaintiff called Lowe to advise him of complaint that Plaintiff was verbally abusive to Mario while in Lowe's custody. Lowe seemed to be in disbelief of the allegations, and vividly recalled Plaintiff attempting to mentor and encourage the young boy. Lowe insisted that he would call Thornell to immediately dispel the complaint as a lie.

74.     February 18, 2015, Thornell and Plaintiff were engaged in a discussion over the way Thornell handled the complaint against Plaintiff. Thornell denied coaching Jackson into complaining against Plaintiff, on a matter that would have generally been handled in-house. Cook would've advised the Command of Plaintiff's complaints by this date, which is why Thornell used Jackson's complaint as a way to commence retaliation for the discriminatory complaints.

75.     February 19, 2015, Plaintiff reported for duty, at which time she delivered Lieutenant C.J. Coughlin ("Coughlin"), a white male, a memorandum requesting that the Command mediate on the issues regarding Plaintiff and Thornell. At that same time, Coughlin immediately, without warning, relieved Plaintiff of her duties, stripped her of her weapon, badge, and advised her to "go home until called to return to duty." Plaintiff had effectively and by all definitions, been relieved of her duties for having done virtually nothing. Coughlin's reasoning was that Plaintiff was insubordinate in her discussion with Thornell the day prior, which is what Thornell falsely stated to the Command.

76.    February 19, 2015, after being relieved of duty, Plaintiff met with new incoming Chief of Police E. Finley ("Finley"). After explaining the reason for being relieved of duty, Finley contacted Jurkofsky by phone to ascertain details of the matter and immediately after his conversation with Jurkofsky, Finley ordered that Plaintiff be reinstated. Plaintiff's weapon and badge was returned immediately after the meeting with Finley.

77.    After Plaintiff was reinstated and returned to work, she begun to receive letters of reprimand for miniscule things that supervisors wouldn't ordinarily enforce or acknowledge. Plaintiff was given a letter of reprimand by Sergeant S. Hudson ("Hudson"), a white male, when she did not return to work with a sick excuse after calling out sick with her two young children.  Plaintiff explained to Hudson that her co-pay was $100 for both children's doctor's visit and that she felt that she could nurse the children back to health with some over the counter medications and return to work without having to pay a visit to the doctor. Hudson was waivered and chose to write Plaintiff in spite of her excuse as to why she didn't visit the doctor. White detectives that called out sick far more often were never asked to provide an excuse from a doctor's office. Prior to complaining of race/sex discrimination, Plaintiff had never been asked by C.I.D. supervisors to produce an excuse before returning to work from being out sick.

78.    As a result of Thornell and Jackson's complaints against Plaintiff, Plaintiff was charged with and investigated on (6) departmental violations to include: Human Relations, Duties to Responsible Employment-Respect to the Public, Insubordination, Abuse of Authority Over Employees or Citizens, Acting in Conflict with the Interest of the City, and Boisterous and Disruptive Activity in the Workplace.

79.    Lieutenant Walker claimed that she received a call from Simmons, after the conclusion of the investigation, who advised her to re-open and amend Plaintiff's case, because he would be charging Plaintiff with Truthfulness at All Times (punishable by termination), for Plaintiff's statement as to whether or not she used a single expletive in the presence of Mario, when referencing his father, Marquise during her interaction with him.

80.    Lieutenant N. Walker stated that the case brought against Plaintiff by the C.I.D. Command had been initially investigated by Lieutenant Wood, or partially investigated by Wood, who apparently utilized some integrity, and honesty in executing his duties, if all true, did not substantiate all charges against Plaintiff that the C.I.D. Command had wished for. And, therefore, she claims she was subsequently assigned the case. Walker substantiated all but one of the charges brought against Plaintiff in her conclusion of the case. Walker insisted that she wanted to look out for me, but the Command wanted the conclusion of the case to yield founded charges against Plaintiff.

81.    On several occasions, Walker contacted Plaintiff by phone to advise her that the outcome of the case was influenced by members of the Staff, particularly Simmons and Jurkofsky.

82.    Jurkofsky was aware of many instances where Thornell had engaged in heated discussions with Corporal G. Schnupp ("Schnupp"), a white male, Robbery

Investigator, who on many occasions was heard exchanging loud harsh language and expletives with Thornell while in the office. Major Jurkofsky and other members of the C.I.D. Command attempted to mediate and insisted that Schnupp remain in the Robbery Bureau and try to work through his differences with Sgt. Thornell as oppose to simply transferring, as Schnupp had asked for. Unlike the Plaintiff, charges were never brought against Schnupp for insubordination, boisterous and disruptive activity in the workplace, and neither was he ordered to attend mandatory psychological counseling for anger management. Schnupp was promoted some time thereafter.

83.     Walker advised that Lowe, during his interview with City Investigations, had "turned on me" and that he had changed his account of events, insisting that Plaintiff did in fact call Mario's father a "piece of shit." Walker says Lowe insisted that Mario was unruly and making statements about how the MPD framed his father and that after Plaintiff had choice words with the boy, he calmed down and Plaintiff began to encourage and uplift him. Walker specifically recalled Lowe saying that Mario was initially mouthy and unruly towards Plaintiff, but that "she [Plaintiff] broke him [Mario] down and built him back up" by attempting to mentor him. On September 11, 2015, Mario was accused of killing a 21-year-old man and was charged with Murder. He is currently awaiting trial.

84.     March 25, 2015, Plaintiff submitted a 25-page memorandum to Finley outlining known instances of racial inequities within the C.I.D. Finely forwarded complaint to City Investigations where Human Resource Director Rudy Martinez ("Martinez") was assigned to investigate the complaint. Martinez failed to interview even a fraction of the over thirty witnesses and culprits mentioned in the memo.

85.     June 4, 2015, City Investigator substantiated all charges against Plaintiff, by way of Walker.

86.     June 4, 2015, Deputy Chief S. Simmons ("Simmons") [then Major Simmons], who had been assigned to the C.I.D. as the new Department Head, removed Plaintiff from the C.I.D., which was effective the following workday, to the Patrol Division as a routine Patrol officer. Simmons also at that time, handed down a recommendation that Plaintiff be suspended for sixty (60) working days without pay and ordered that Plaintiff attend mandatory psychological counseling for anger management, as well as a clinical fitness for duty evaluation by the City physician prior to returning to normal duty.

87.     Simmons advised during the June 4th meeting that Cook was responsible for arranging and ordering Plaintiff's recommendations for said punishment. He claimed that he had "nothing to do with the suspension" because he had just been transferred to the C.I.D. from the Special Ops Division. Simmons claimed he knew nothing of the details and that Cook recommended all of said recommendations of punishment. Simmons replaced Jurkofsky after Jurkofsky was promoted to the rank of Deputy Chief of Operations.

88.     When the C.I.D. Command was questioned by the EEOC investigator as to

why Plaintiff was removed from her position as an investigator, she was falsely advised that Plaintiff had failed to maintain and manage her cases. Plaintiff was not warned about mismanagement of case files by C.I.D. supervisors, because if she had, the C.I.D. Command would have quickly brought charges against her for it as well.

89.     June 24, 2015, Plaintiff appealed suspension, Finley decreased suspension to twenty-nine (29) working day suspension without pay. Finley cited his "hands were tied" as reason for not completely dismissing charges against Plaintiff.

90.     June 26, 2015, three weeks after Plaintiff was transferred to Patrol, rookie General Crimes detective C. Ogletree, a white female, who was only assigned to the C.I.D. for approximately one year, was transferred to the Homicide Bureau. Ogletree had no desire to be a Homicide detective and had expressed on various occasions that she wanted to return to the Gang Unit. Ogletree was placed into the Bureau as a Homicide detective to satisfy Plaintiff's complaint of discrimination of blacks and women in the Homicide Bureau. Ogletree resigned from the MPD some months later.

91.     August 17, 2015, Plaintiff appealed suspension in person to Director Murphy's office. Suspension was upheld.

92.     August 17, 2015, during the Director's appeal hearing, Thornell lied under oath when asked if he had ever been involved in a quarrel(s) or heated discussion with subordinate detectives or other C.I.D. employees as a supervisor at the C.I.D. Thornell clearly stated, "no." Thornell's past quarrels were  well known by all subordinate and supervisory C.I.D. personnel. Although Thornell's known lies were made in the presence of high-ranking C.I.D. personnel that knew his statements to be lies, Charges of Truthfulness at All Times were not brought against Thornell.

93.     The Montgomery Police Department has not employed an African American female as a Homicide detective since early 1990s where a single African American woman was the first and only Homicide investigator within the department to date.

94.     The C.I.D. Command falsely stated that Plaintiff was not transferred to the Homicide Bureau because she was African American or female, but simply because a letter of transfer "by policy" must be submitted through the C.I.D. Chain of Command in order to be considered. When the Command was asked to produce the transfer letters of the last four detectives transferred to the Homicide Bureau (all of which happen to be white males), the C.I.D. was unable to produce those letters, because they simply don't exist. The transfer letter policy is generally only true for officers interested in a transfer to the Homicide Bureau, who are not assigned to the C.I.D. as an investigator, or in an investigative capacity, but are assigned to other bureaus, i.e. the Patrol Division. C.I.D. investigators are shown courtesy by being allowed to inner-divisionally transfer without a letter of transfer.

95.     July 15, 2015, Plaintiff hand delivered a seventeen (17)-page memorandum to Mayor Strange and Director Murphy, detailing all significant events

and complaints to the department, to include Plaintiff's first public outing of Chief Cook's sexual advances and phone messages that corroborate the existence of the meeting. Strange, nor Murphy attempted to acknowledge or rectify Plaintiff's complaints of race/sex discrimination, retaliation or the sex harassment endured by Cook. That is, until Cook was caught in his own shameful and public scandal between over two women. Cook was forced to resign after news of the scandal surfaced. The day after the scandal was publicized, Plaintiff received a letter in the mail from Director Murphy, asking that Plaintiff furnish more details of the events that took place in Plaintiff's meeting with Cook.

96.   August 27, 2015, Plaintiff appealed suspension in writing to Personnel Director, Carmen Douglas ("Douglas"), who approved hearing.

97.   Douglas abruptly canceled the scheduled November 10th City-County Personnel Board hearing, 45 minutes before it commenced, without due warning or explanation.

98.   November 12, 2015, Plaintiff was contacted by Douglas, who falsely explained that Plaintiff's suspension must be "served" before it can appealed, which she claims was her initial bases for canceling the hearing. As the Personnel Director and as the department head over the implementation of City policy, personnel and procedures, she claimed not to have known that the suspension would have to be served before it is appealed, which is untrue.

99.   Douglas, City policy examiner and personnel director, later claimed she had "mistakenly" approved Plaintiff's hearing, suggesting that she somehow misinterpreted the language within the policy.

100.   November 12, 2015, Plaintiff met with Wingard in an attempt to get clarification Douglas' claims of the suspension. Wingard insisted that Douglas' claim "were not true." And, that "unless it had changed over the years, I've never heard of that policy." Wingard failed to correct Douglas' conveniently wrongful interpretation of the policy, having fully known that Douglas' statements were not correct.

101.   November 18, 2015, Finley surgically reduced Plaintiff's suspension from twenty-nine (29) working days, to twenty-nine (29) calendar days. In accordance with the policy, the correction in suspension days automatically rendered Plaintiff ineligible for a final means of appealing suspension to the City-County Personnel Board, which Finley was well aware of.

102.   November 18, 2015, Finley advised that he, Mayor Strange and Director Murphy "dissected" the issue of Plaintiff's suspension and collectively decided to decrease said suspension days, which is a direct infringement upon Plaintiff's due process of rights.

103.   November 19, 2015, Plaintiff wrote memorandum and hand delivered to

Douglas' office, detailing all racially discriminatory and sexually involved events, asking that Douglas overturn decision to bar Plaintiff's hearing to the personnel board. Douglas declined, citing that Plaintiff was no longer eligible for a hearing with the Personnel Board because the police department had decreased and "corrected" the number of suspension days.

104.     November 20, 2015, Plaintiff contacted Douglas via email, requesting that she be allowed to receive a Board hearing in order to appeal suspension. City Personnel claimed the decision to deny Plaintiff's additional Board hearing request after its cancelation, was due to Plaintiff's failure to specifically request a hearing based on Title VII violations. Douglas was fully aware of Plaintiff's Title VII allegations. Douglas continuously lied about her reasoning for denying Plaintiff the right to a hearing, after she had approved it. Douglas initially stated cancelation was due to Plaintiff having to actually serve the suspension, then she went on to say she made an error in initially approving the hearing, citing that she'd made a mistake interpreting the policy's language. She insisted that I was no longer eligible for a hearing after the MPD reduced the number of suspension days. Lastly, she advised the EEOC Plaintiff was not allowed to appeal because she did not specifically request a Board hearing based on Title VII violations. Douglas, City Legal, Staff members of the Montgomery Police Department, Strange and Murphy are all responsible in helping prevent Plaintiff from seeking a Board hearing, which was their way of preventing the police department from being exposed.

105.     On or about June 2017, Walker advised that she was contacted via City cellular phone on a near daily basis, by a certain high-ranking black male Staff member, who she says expressly advised her to unfavorably alter the outcome of an investigation into another high-ranking black male Staff member's case (who he had been previously feuding with), involving the alleged sexual harassment of another City employee. Walker insisted that the case was initially assigned to and investigated by Lieutenant Wood, but that it was transferred to her by Sams on the direct order of the high-ranking black male Staff member who had contacted her by phone. Walker insisted that because Wood failed to produce charges that were specifically punishable by termination, she was then utilized as a vessel to produce the desired charges against the Staff member. Walker, without due cause, ultimately substantiated charges of Conduct Unbecoming of an Officer, and the accused Staff member was ultimately forced to resign from the MPD shortly thereafter. Plaintiff was advised by Walker throughout the course of Plaintiff's investigation, that Plaintiff's case was handled similarly, insisting that her decision to substantiate charges was influenced instead, by white male staff members. And, that Plaintiff's case was initially handled by Wood, but was later transferred to Walker after Wood failed to produce the desired charges that the Staff members were hoping to achieve. Walker insisted that Plaintiff had a "target on her back" and that it was all "payback" for complaints made in the twenty-five page memorandum" addressed to Finely in March 2015. Walker's constant statements as to the influence that Staff has on the outcome of City Investigations speaks volumes towards the lack of integrity and impartiality that employees hope for when they stand to be interviewed by Office's investigators. That being said, the Plaintiff was a victim of clear and unprecedented retaliation for voicing complaints of discrimination. Walker's open confessions of involvement in helping to

retaliate against her fellow officers provides insight into exactly how far the department will reach to ensure that they destroy anyone who dares offer resistance against their way of order. It is beyond the Plaintiff as to why Walker would disclose such disheartening instances of unfair treatment practiced within the City Investigations Office. It is also unfathomable why Walker would be willing to continuously implicate herself as a perpetuator of unethical and retaliatory practices against City employees, who simply wish for a fair, impartial and unbiased, investigation into their cases.

**IV.    CLAIMS**

## COUNT I-RETALIATION-42 U.S.C. 1981

106.    The Plaintiff adopts and re-asserts each and every allegation contained in paragraph 1-105 as if fully set out herein.

107.    Plaintiff engaged in a statutorily protected activity when she filed a claim against the City for racial/ sex discrimination.

108.    The City retaliated against Plaintiff when it selectively reprimanded Plaintiff for not returning to work with a sick excuse from doctor's office after being out sick with her young children.

109.    The City retaliated against Plaintiff when it selectively chose not to discipline whites that did not return to work with sick excuses.

110.    The City retaliated against Plaintiff when it discriminated against African American females wishing to transfer to Homicide Bureau.

111.    The City retaliated against Plaintiff when it failed to transfer Plaintiff to Homicide Bureau over far less experienced white detectives.

112.    The City retaliated against Plaintiff when it discriminatively disciplined Plaintiff harsher than that of white employees, who committed more invasive and egregious offenses.

113.    The City retaliated against Plaintiff when it failed to preserve and protect due process to appeal disciplinary actions against her to the City-County Personnel Board.

114.    The City retaliated against Plaintiff when it arbitrarily relieved Plaintiff of duty.

115.    The City retaliated against Plaintiff when it removed Plaintiff from her position as a Major Crimes investigator to the Patrol Division.

116.    The City retaliated against Plaintiff when it accused, investigated and substantiated excessive and unwarranted charges against Plaintiff.

117.    The City retaliated against Plaintiff when it utilized City Investigators to

perpetuate wrongful and unethical retribution against Plaintiff after she complained of racial discrimination.

118.    The City retaliated against Plaintiff when it refused to dismiss charges against her.

119.    The City retaliated against Plaintiff when it ordered Walker to re-investigate an already closed case, in order to add an additional charge of Truthfulness at all Times, as a way to initiate Plaintiff's termination.

120.    The City retaliated against Plaintiff when it failed to fully investigate/ interview over thirty (30) witnesses named in Plaintiff's written race/sex discrimination complaint.

121.    The City retaliated against Plaintiff when it engaged in selective administration of discipline to favor white officers and against officers of color.

122.    The City retaliated against Plaintiff when it re-opened a closed case investigated by Walker, in order to bring charges against Plaintiff for Truthfulness At All Times.

123.    The City retaliated against Plaintiff when it abruptly canceled City-County Personnel Board hearing, without merit.

124.    The City retaliated against Plaintiff when it fabricated the reason for cancelling Board hearing.

125.    The City retaliated against Plaintiff when it cancelled Plaintiff's Board hearing without due process.

126.    The City retaliated against Plaintiff when it deliberately reduced Plaintiff's suspension days in order to prevent her from testifying at City-County Personnel Board hearing.

127.    The City retaliated against Plaintiff when it forced Plaintiff to sign a Suspension Notification document, which forced her to agree to accept contested suspension, just days after Board hearing was cancelled.

128.    City retaliated against Plaintiff when it suspended Plaintiff for twenty-nine (29) days without due process.

129.    The City retaliated against Plaintiff when it suspended Plaintiff for twenty-nine (29) days without pay.

130.    The City retaliated against Plaintiff after she rallied officers at the MPD South Central substation in an attempt to encourage formation of a police union.

131.    The fact that Plaintiff had previously complained of race/sex

discrimination against the City is the reason for the City's decision to issue excessive punishments against Plaintiff.

132.    As a proximate result of the City's conduct, Plaintiff suffered the following damages: Compensatory damages including but not limited to: lost wages (front and back), lost seniority, out of pocket expenses; emotional distress to include, but not limited to: damage to image in the community, damage to career in the community, embarrassment, humiliation, stress, anger, financial difficulty, fear of further retaliation, and fear of ability to support family.

## COUNT I-RETALIATION-42 U.S.C. 1983

133.    The Plaintiff adopts and re-asserts each and every allegation contained in paragraphs 1-132 as if fully set out herein.

134.    The City subjected Plaintiff to conduct that occurred under color of State law.

135.    The City's conduct deprived Plaintiff of rights, privileges, or immunities guaranteed under federal law or the U.S. Constitution including, but not limited to, the right against unlawful racial discriminatory treatment and equal protection under the law by Fourteenth Amendment, and Fifth and Fourteenth Amendment Due Process clauses acting as safeguards from arbitrary denial of life, liberty and property.

136.    The City's conduct complained of herein was in accordance with a policy, custom, and practices of race and sex discrimination against African American women.

137.    The City's decision to interfere and disrupt Plaintiff's right to due process of law after Plaintiff complained of discriminatory acts within the department, which caused further adverse employment actions after the federally protected complaint of discrimination, also violate the fifth and fourteenth Amendments to the Constitution.

138.    The actions of the City violate clearly established law.

139.    As a proximate result of the City's conduct, Plaintiff suffered the following damages: Compensatory damages including but not limited to: lost wages (front and back), lost seniority, out of pocket expenses; emotional distress to include, but not limited to: damage to image in the community, damage to career in the community, embarrassment, humiliation, stress, anger, financial difficulty, fear of further retaliation, and fear of ability to support family.

## COUNT III-RACE/SEX DISCRIMINATION and/or RETALIATION 42 U.S.C. 2000(e) et. Seq.

140.    The Plaintiff adopts and re-asserts each and every allegation contained in paragraphs 1-139 as if fully set out herein.

141.    Plaintiff engaged in a statutorily protected activity when she filed a claim

against the City for race/sex discrimination.

142.    Plaintiff's Command was advised of said complaint against the City of Montgomery.

143.    The City pursued/ investigated charges of departmental infractions, suspended Plaintiff without pay, removed Plaintiff from role in the investigations bureau and refused to allow Plaintiff right to Board hearing, because she filed a race/sex based complaint against the City of Montgomery.

144.    The City falsified its reasons for harshly reprimanding Plaintiff.

145.    The City uses its City Investigations Office as a means to control the influence over investigations into employee's conduct in order to manipulate process to suit its interest.

146.    The City aided in perpetuating retaliatory conduct by producing desired results of active investigations.

147.    The City engaged in multi-dimensional, multi-departmental, acts of retaliation against the Plaintiff after she complained of race/sex discrimination within the department.

148.    As a proximate result of the City's conduct, Plaintiff suffered the following damages: Compensatory damages including but not limited to: lost wages (front and back), lost seniority, out of pocket expenses; emotional distress to include, but not limited to: damage to image in the community, damage to career in the community, embarrassment, humiliation, stress, anger, financial difficulty, fear of further retaliation, and fear of ability to support family.

## COUNT IV-RACE/SEX DISCRIMINATION- DISPARATE TREATMENT 42 U.S.C. 2000(e) et. Seq.

149.    The Plaintiff adopts and re-asserts each and every allegation contained in paragraphs 1-148 as if fully set out herein.

150.    The City treated similarly situated white detectives different from black detectives by offering to intervene and mediate with white detectives that endured known heated exchanges with their supervisors.

151.    The City treated similarly situated white detectives different from black female detectives when it chose not to honor Plaintiff's request, who was far more qualified than the white males transferred to bureau.

152.    The City treated similarly situated white detectives different from black detectives by excessively disciplining African American detectives, but failing to discipline white detectives for the same or far more egregious offenses.

153.    As a proximate result of the City's conduct, Plaintiff suffered the

following damages: Compensatory damages including but not limited to: lost wages (front and back), lost seniority, out of pocket expenses; emotional distress to include, but not limited to: damage to image in the community, damage to career in the community, embarrassment, humiliation, stress, anger, financial difficulty, fear of further retaliation, and fear of ability to support family.

## V.     **DAMAGES**

154.    Plaintiff suffered the following damages: Compensatory damages including but not limited to: lost wages (front and back), lost seniority, out of pocket expenses; emotional distress to include, but not limited to: damage to image in the community, damage to career in the community, embarrassment, humiliation, stress, anger, financial difficulty, fear of further retaliation, and fear of ability to support family.

## VI.    **PRAYER FOR RELIEF**

155.    WHEREFORE, the Plaintiff respectfully prays that her court assume jurisdiction of this action and after trial:

156.    Enter an order requiring the defendant to make the plaintiff whole by awarding her lost wages (plus interest), compensatory and punitive damages, lost seniority, out of pocket expenses and other benefits of employment. Plaintiff is further seeking injunctive relief and promotional redress.

157.    Plaintiff further prays for such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorney's fees and expenses.

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY.**

Respectfully submitted,

H. Renee James

9601 FRENHAM DR
PIKE ROAD, AL· 36064
(304) 873-6334

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

## CERTIFICATE OF SERVICE

I, H. Renee James, do hereby certify that a true and correct copy of the foregoing has been furnished by United States Mail, on this ___4th___ day of ~~June~~ 2017:

_August_

City of Montgomery (Mayor's Office)
Care of: Todd Strange, City of Montgomery Mayor
103 N. Perry Street
Montgomery, AL. 36104

City of Montgomery (Department of Public Safety)
Care of: J. Christopher Murphy, Director of Public Safety
103 N. Perry Street
Montgomery, AL. 36104

City of Montgomery (Police Department)
Care of: Earnest Finley, Chief of Police
320 N. Ripley Street
Montgomery, AL. 36104

City of Montgomery (Police Department)
Care of: Christopher A. Wingard, Chief of Staff
320 N. Ripley Street
Montgomery, AL. 36104

Brian Jurkofsky, Former MPD Deputy Chief of Police
395 Magnolia Loop
Millbrook, AL. 36054

Ron Cook, Former MPD Deputy Chief of Police
2061 Short Line Drive
Montgomery, AL. 36116

William S. Simmons, Former MPD Chief of Operations
3720 Henderson Place
Millbrook, AL. 36054

City of Montgomery (Police Department)
Care of: Lieutenant Natasha Walker
1751 Congressman Dickerson Drive
Montgomery, AL. 36109

Sergeant Bruce Thornell (Retired)
2781 Ashley Avenue
Montgomery, AL. 36109

City of Montgomery (Police Department)
Care of: Donald Lowe
320 N. Ripley Street
Montgomery, AL. 36104

City Investigations
Care of: Director Ronald F. Sams, Director of City Investigations
300 Water Street
Montgomery, AL. 36104

City of Montgomery (Human Resources Department)
Care of: Rudy Martinez
27 Madison Avenue
Montgomery, AL. 36104

City of Montgomery (Personnel Department)
Care of: Carmen Douglas, Personnel Director
27 Madison Avenue
Montgomery, AL. 36104

H. Renee James
Pro se

8/4/17