# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

H. RENEE JAMES,                          )
                                         )
      Plaintiff,                    )
                                         )
v.                                       )    **CASE NO. 2:17-cv-528-ALB**
                                         )
CITY OF MONTGOMERY,                      )
                                         )
      Defendant.                    )
                                         )

## MEMORANDUM OPINION AND ORDER

Plaintiff H. Renee James brought this employment discrimination action against her former employer, the City of Montgomery (the "City"),[1] alleging (1) race and sex discrimination under Title VII of the Civil Rights Act, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1983 ("§ 1983"); (2) race discrimination under 42 U.S.C. § 1981 ("§ 1981"); and (3) retaliation under Title VII and § 1981.[2] (Doc. 85). This matter comes before the Court on the City's Motion

---

[1] James originally filed this action against the City, the City of Montgomery Police Department (the "Police Department"), the City of Montgomery Personnel Department, the City of Montgomery City Investigations ("City Investigations"), and several individually-named defendants. *See* Doc. 1. On September 21, 2017, the City, the Police Department, and City Investigations moved to dismiss the action for failure to state a claim (Doc. 23), which was granted as to only the Police Department and City Investigations. (Doc. 65). All other defendants, except the City, have since been dismissed with prejudice pursuant to the parties' Joint Stipulation of Dismissal. (Docs. 116 and 117).

[2] James's Amended Complaint also asserts claims against the City for retaliation under § 1983 and a hostile work environment under Title VII, § 1981, and § 1983. (Doc. 85). Pursuant to the parties'

for Summary Judgment. (Doc. 114). For the reasons stated below, the motion is due to be granted.

## BACKGROUND

James, an African American female, was employed by the City as a police officer for fourteen years. From June 2010 until June 2015, James worked as a detective in the Criminal Investigations Division ("CID"). Specifically, from June 2010 until approximately February 2015, James was a Robbery detective in the Major Crimes Bureau and was the only African American female assigned to that bureau. From approximately February 2015 until June 2015, James was a detective in the General Crimes Bureau.[3] And in June 2015, James was reassigned to the Patrol Division as a Corporal and eventually promoted to Sergeant.[4] While employed by

Joint Stipulation of Dismissal (Doc. 116), those claims have been dismissed with prejudice. (Doc. 117).

[3] Though it is unclear from the record, it appears that there were several restructurings of the Police Department over the years. According to James, she was transferred from the Major Crimes Bureau to the General Crimes Bureau for a brief period between the end of February and June 2015.

[4] Paragraph 2 of James's Declaration states that "at the time [of her discharge from employment], [she] was assigned to the Major Crimes Robbery/Homicide Bureau, as a Robbery Detective." But the evidence in the record, including James's deposition testimony, is clear that she was transferred to the Patrol Division in June 2015 and remained in that division until her termination in November 2017, and thus the Court disregards that statement in Paragraph 2. *See generally Scott v. Harris*, 550 U.S. 372, 381 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

the City, James was subject to multiple disciplinary actions, which, under the City's progressive discipline policy, ultimately led to her termination in November 2017.

## I.    James's Relevant Discipline History

### A. 2013 Suspension

On April 16, 2013, when James was on her way to work, she received a call from her daughter, who was on the school bus. James's daughter informed James that a boy hit her during a fight on the bus. After receiving her daughter's call, James activated her emergency equipment on her patrol vehicle, pulled her vehicle in front of the bus to stop it on its route, entered the bus and removed the boy, and detained him in the back of her vehicle until a county deputy arrived at the scene.[5] This incident occurred while James was off duty and outside of the police jurisdiction of the City of Montgomery. According to James, immediately after the incident, she fully disclosed the details to her supervisor, Sergeant Hall (white male),[6] but Sgt. Hall failed to notify CID Command[7] of the incident and told the Commander of the

---

[5] According to James, when she stopped the bus, her daughter had been badly beaten, and the male juvenile was ultimately charged with misdemeanor assault. The bus's video surveillance captured the altercation between the male juvenile and James's daughter and James's actions on the bus.

[6] The race and gender of each individual involved in the incidents related to this lawsuit are not clear from the record. Thus, the Court only indicates the race and gender of an individual where it is clearly identified in the record.

[7] Given the context in which it is used, the Court assumes that CID Command is made up of more than one person (and is not the same as the Commander of CID), though it is unclear from the record.

CID, Major Bryan Jurkofsky (white male), that James did not fully disclose the incident.

James's conduct related to this incident violated multiple policies established by the City and the Police Department. As a result, James was charged with violating the following policies: (1) Article II, Section 2.102 Duties of Responsible Employment (Engaging in any activity which may reflect negatively on the integrity, competency, or ability of the individual to perform his/her duty, or may reflect negatively on the Department); (2) Article II, Section 2.111 Duty in Off Duty Arrest; and (3) Article II, Section 2.102 Duties of Responsible Employment (Prompt and accurate reporting of all official matters).

Under the City's progressive discipline policy, James's offense was considered a Category B-Major Violation. A Category B violation can begin at any of the five discipline steps. Though this was James's first Category B offense, due to the seriousness of the offense, the recommended disciplinary action began at Step 3 under the policy, which has a punishment range of a five (5) to fifteen (15) day suspension. Major Jurkofsky recommended to Chief of Police Kevin Murphy that James be suspended for 120 working hours and required to attend mandatory counseling for anger management. Chief Murphy upheld Major Jurkofsky's recommendation and made the same recommendation to Director of Public Safety Christopher Murphy ("Director Murphy"). James waived her right to a hearing

before the Mayor, and on June 12, 2013, the Mayor issued his decision to suspend James for 120 working hours. James was suspended from July 10 until July 30, 2013.

Sometime later in 2014, James observed an African American male, who had been arrested and appeared to have been beaten, being brought into the CID. According to James, in relation to this incident, Detective Christopher Hogan (white male) was suspended for violating the Use of Excessive Force policy in some way.[8]

B. 2015 Suspension

On February 8, 2015, 15-year-old Marquise Woodward was arrested by another officer and encountered James during the booking process. Woodward's father was convicted in 2008 of murdering a Montgomery police officer. When Woodward claimed that the police framed his father, James told Woodward that his father had killed a cop and that he was a loser. The next day, Woodward's mother contacted Sergeant Bruce Thornell (white male), James's supervisor at the time, to file a complaint against James regarding the incident.[9]

---

[8] James's statements throughout the record, including her Declaration, alternate between whether the suspension was a three- or four-day suspension. However, this distinction is immaterial to the Court's analysis.

[9] According to the City's records, Woodward's mother reported to Sgt. Thornell that James called Woodward's father a "piece of shit" and "continually degraded [Woodward] because of who his father was." She also claimed James "threatened bodily harm to him." The arresting officer, Officer Lowe, also reported to Sgt. Thornell that James "stated to Woodward 'that piece of shit is your father.'"

On February 19, 2015, Sgt. Thornell met with James to discuss the February 8, 2015 incident and to discuss James being tardy that day without notifying him. But in the meeting, James, who had previously been counseled for disrespectful behavior toward her supervisors, became hostile and disrespectful. Sgt. Thornell contacted another sergeant, Sergeant T.D. James (black male), to come to his office to serve as a witness. After the incident, Lieutenant C.J. Coughlin obtained statements from James, Sgt. Thornell, and Sgt. James. According to Sgt. James's statement, Sgt. James informed Sgt. Thornell after the incident that James's behavior was inappropriate and needed to be addressed. In addition, Sgt. James stated that James exhibited a lack of respect for Sgt. Thornell during the entire conversation and that, during his time with the department, he had never witnessed that type of interaction between a supervisor and subordinate. In James's statement, she admitted that she lacked tact and diplomacy and used a "less than amicable disposition and tone when expressing matters of concern with Sgt. Thornell." She also described her discussion with Sgt. Thornell as "extremely argumentative" and stated that Woodward's father was "in fact the 'loser' [she] categorized him as." James was briefly relieved of her duties,[10] but she was reinstated by Chief of Police Ernest N. Finley within the hour on the same day.

---

[10] Based on the record, particularly James's own statements, it is unclear by whom James was relieved of her duties. At times, James claims that Major Jurkofsky relieved her of her duties, and at other times, she claims that Lt. Coughlin relieved her of her duties.

Based on these two incidents, James was ultimately charged with several violations of departmental and city handbook policies, including: (1) Article I, Section 1.401 Human Relations, (2) Article II, Section 2.102 Duties of Responsible Employment (Respect to the Public), (3) Insubordination or lack of cooperation, (4) Abuse of authority over employees or citizens, (5) Acting in conflict with the interests of the City, and (6) Boisterous or disruptive activity. Due to the nature of James's offenses, they were again classified as Category B violations, which moved her to Step 4 under the City's progressive discipline policy. The punishment range for a Category B, Step 4, violation is 16 to 29 days. For each incident—the February 8 incident and the February 19 incident—Major William Simmons, the Commander of the CID at the time, recommended a 232-hour, or 29-working day, suspension to Chief Finley.

On June 4, 2015, James was served with a statement of disciplinary charges for these incidents, and on June 24, 2015, Chief Finley met with James. On July 7, 2015, Finley overturned the recommendation and reduced the recommended suspension from 464 cumulative hours to 232 cumulative hours, also noting that effective June 5, 2015, James had been transferred to the Patrol Division. Chief Finley forwarded the recommendation to Director Murphy. After James's hearing before the Mayor, the Mayor issued a decision to suspend James for 232 hours, or

29 working days.[11] Prior to James serving her suspension, Chief Finley was advised that, based on practice, James's suspension should have been 29 calendar days, not working days. Thus, James's suspension was ultimately reduced to 29 calendar days, which she served from November 23, 2015, until December 21, 2015.

According to James, James's February 19, 2015 discussion with Sgt. Thornell was not the first hostile discussion between them. James claims that Sgt. Thornell shouted at and treated her in a hostile manner almost daily in 2013, and that during this time period, Sgt. Thornell told her that she was "just like his wife" and that women "are all the same." James did not report any of these incidents to her superiors until 2015. James also claims that Sgt. Thornell was difficult to work with for everyone and that he treated other subordinates in a hostile manner, including Corporal G. Schnupp (white male), who she claims had similarly heated or more heated conversations with Sgt. Thornell but was never charged with insubordination or boisterous and disruptive activity.

C. 2017 Termination

---

[11] James appealed her initial suspension of 29 working days to the Montgomery City Personnel Board on August 28, 2015. The Personnel Board is part of the Personnel Department, which is a separate entity from the City, and consists of three appointed members who, in part, advise the governing bodies of the county and municipality on issues concerning personnel administration and hear and decide appeals submitted by City-County employees related to any situation connected with employment status or conditions of employment. James's hearing was scheduled for November 10, 2015, but was canceled because the proper form to make the suspension official had not yet been completed by the Police Department.

On September 20, 2017, James sent an email to Captain Albert Wheeler, which was solicited, regarding her opinion related to retention issues in the Police Department. On September 26, 2017, James sent a different, unsolicited email to Chief Finley, Chief of Operations John Bowman, and Chief of Staff Chris Wingard regarding her opinion related to retention issues "just in case Wheeler didn't forward [her] message through to any of [them]." After receiving James's email and contacting Mickey McInnish, Senior Staff Attorney in the City's Legal Department, Chief Bowman requested that Major Shannon Youngblood, Commander of Sector B at the time, review the email and recommend disciplinary action based on the content of the email. For instance, the email stated, in part: "This department is being run like a dictatorship in a small Middle Eastern country."

Major Youngblood determined that James's email violated Article II, Section 2.102 Duties of Responsible Employment (Respect to Superior Officers). Aware of James's pending lawsuit alleging disparate treatment, Major Youngblood contacted the Legal Department to determine how to proceed with disciplinary action. Major Youngblood was advised that, in her complaint, James referenced a white detective, Detective Geier, who was allegedly charged with violating the same policy when he was disrespectful to his African-American female supervisor, so Major Youngblood pulled Det. Geier's disciplinary action and confirmed that the detective had been charged with the same violation—Respect to Superior Officers. In that case, the

violation was treated as a Category B violation. Given the parallel nature of the offenses, Major Youngblood determined that James's offense was a Category B violation.

This was James's third Category B violation, and based on her previous disciplinary actions, this placed her at Category B, Step 5, under the progressive discipline policy, which is termination. Following the progressive discipline policy, on October 16, 2017, Major Youngblood recommended to Chief Finley that James be terminated. After reviewing the evidence and meeting with James per her request under the progressive discipline policy, Chief Finley upheld Major Youngblood's recommendation and likewise recommended to Director Murphy that James be terminated. The Mayor issued his decision to terminate James on November 21, 2017, and James was terminated on November 28, 2017.

## II.    James's Complaints of Race and Sex Discrimination

On January 23, 2015, James met with Deputy Chief Ron Cook and verbally complained about alleged hostility—specifically from Sgt. Thornell—and incidents that she felt were clear race and sex discrimination "handed down by the CID Command," including being denied a transfer from Robbery to Homicide. At two times during this meeting, James claims that Deputy Chief Cook made inappropriate sexual comments regarding her clothing while seductively licking and biting his lips. When asked by Deputy Chief Cook whether she wanted him to have CID Command

investigated or whether she wanted him to handle it discreetly by speaking with Major Jurkofsky, James told him she did not mind if he spoke with Major Jurkofsky—she just wanted it to be handled. On February 5, 2015, James contacted Chief Deputy Cook to see if he had spoken with Major Jurkofsky because she claimed Sgt. Thornell's treatment toward her had worsened. Deputy Chief Cook advised her that he had not contacted anyone regarding their conversation.

According to James, after she made complaints of race and sex discrimination, she received letters of reprimand for "miniscule things" and her performance was "nitpicked." Specifically, on March 4, 2015, Sergeant Hudson, who was James's supervisor in the General Crimes Bureau, asked James to provide a doctor's excuse because she called in sick with less than 40 hours of accumulated sick time available. Because James failed to provide a written excuse, she received a Written Warning. This was the first time James had been asked by CID supervisors to provide a doctor's excuse after being out sick.

In addition, James claims that at some point she was "repeatedly" passed over or not considered for a transfer to the Homicide unit.[12] According to James, the Homicide unit asserted that James's transfers were denied because a letter of transfer

---

[12] James at no point identifies when she was allegedly passed over for these transfers. Nevertheless, though the record suggests that these alleged transfer denials occurred prior to 2015, the Court views the evidence in the light most favorable to James and assumes for purposes of summary judgment only that at least one transfer denial occurred after her complaints of discrimination.

must be submitted through the CID Chain of Command to be considered. But James claims that the policy regarding transfer letters is generally only true for officers who are assigned to other bureaus, such as the Patrol Division, not for officers who are assigned to the CID as an investigator or in an investigative capacity. She claims the latter are shown courtesy by being allowed to inter-divisionally transfer without a letter of transfer.

On March 13, 2015, James provided a written complaint—a 23-page letter—to Chief Finley outlining what she believed to be racially and sexually discriminatory behavior as well as retaliation. One of her complaints was that CID Command finds a way to rectify complaints without involving Internal Affairs or written discipline when the officer is part of their "clique" or "one of their white counterparts" but not when the officer is black.

On March 17, 2015, Rudy Martinez was appointed, with the assistance of another investigator, to conduct an investigation regarding James's allegations that the CID discriminated against individuals with respect to how they were disciplined, promoted, and moved within the department. Martinez was selected by the Director of City Investigations because he did not know any of the participants and did not answer to anyone involved in the incident. His investigation included interviews of co-workers and supervisors in James's department, a review of documents and case files related to other complaints made by James to City Investigations, a review of

case files of investigations James conducted in her capacity as a detective, and an examination of the race and sex of individuals recently promoted and in current positions within the Police Department. Neither the Director of City Investigations nor the Police Department Command Staff ordered or directed the outcome of Martinez's investigation.

James filed her initial EEOC Charge on May 8, 2015, alleging race and sex discrimination and retaliation based on her complaints of discrimination. James filed her second EEOC Charge on November 30, 2015, again alleging race and sex discrimination and retaliation. The EEOC issued James's Notice of Right to Sue letter on May 8, 2017, and James filed this action on August 4, 2017.

## STANDARD OF REVIEW

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013).

If the moving party meets its burden, the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is

a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). But "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1996). The Court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

## DISCUSSION

## I. Preliminary Matters

For the most part, James has failed to create a factual record on which the Court can evaluate the claims in her Complaint. The only evidence she submitted in opposition to summary judgment is her own declaration (Doc. 122-1), which generally reasserts her Complaint's allegations. But that declaration is full of inconsistencies, speculation, ambiguities, and statements made without personal knowledge. *See Larken v. Perkins*, 22 F. App'x 114, 115 (4th Cir. 2001) (noting that plaintiff's "self-serving affidavit containing conclusory assertions and unsubstantiated speculation" was properly found by the district court "to be insufficient to stave off summary judgment").

In its reply brief, the City raises a "general objection" to several specific statements in James's Declaration (Doc. 122-1), arguing that such statements are based on inadmissible hearsay and are not based on James's personal knowledge. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); Fed. R. Civ. P. 56(c)(4) (stating that a declaration filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated"). The Court will disregard any improper statements in the declaration and consider the remainder of the declaration, which will be addressed as necessary herein. *See Dortch v. City of Montgomery*, Nos. 2:07-cv-1034 and 2:07-cv-1035, 2010 WL 334740, at *1 (M.D. Ala. Jan. 22, 2010) (noting that courts may strike or disregard improper statements in affidavit but consider the rest of the affidavit).

## II.     Discrimination Claims

James asserts race and sex discrimination claims against the City under Title VII, § 1983, and § 1981 (race only). Because these claims have the same requirements of proof and are analyzed under the same framework, the Court addresses James's intentional discrimination claims with the understanding that its analysis applies equally to each claim. *Lewis v. City of Union City, Ga.*, 918 F.3d

1213, 1220-21 (11th Cir. 2019); *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1335 (11th Cir. 2015) ("Though [plaintiff] brought claims under the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. §§ 1981 and 1983 as well, their fates rise and fall with his Title VII claims.").

A. McDonnell-Douglas Framework

Absent direct evidence, a claim for intentional discrimination is analyzed under the familiar burden-shifting framework established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Flowers*, 803 F.3d at 1335. Under the *McDonnell-Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. *Id.* at 1336. To establish a *prima facie* case, a plaintiff must show that (1) she was in a protected class, (2) she was qualified to perform the job, (3) she suffered an adverse employment action, and (4) other similarly-situated individuals outside of her protected class were treated more favorably. *Lewis*, 918 F.3d at 1220-21. If the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *Flowers*, 803 F.3d at 1336. Once the employer meets its burden of production, the burden shifts back to the plaintiff to show that the employer's proffered reason is pretext for unlawful discrimination. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011).

James was explicitly asked in her deposition whether she believed her 2015 suspension or her termination was based on her race or sex, and she unequivocally responded, "No." (Doc. 114-4 at 59). In light of James's sworn deposition testimony that she does not believe that she was suspended or terminated because of her race or sex, the Court need not address the arguments of her counsel to the contrary. *See Ross v. Jefferson Cnty. Dep't of Health*, 701 F.3d 655, 661 (11th Cir. 2012) (holding that plaintiff waived her race discrimination claim by responding "no" when asked during her deposition whether she thought that her termination was related to her race). Instead, James's discrimination claims appear to center around three potential adverse employment actions: (1) her 2013 suspension, (2) her March 4, 2015 Written Warning,[13] and (3) the denials to transfer her from the Robbery unit to the Homicide unit.

First, the City argues that James has failed to demonstrate that the denial of a transfer from the Robbery unit to the Homicide unit is an adverse employment action.[14] The Court agrees.

---

[13] Though the Court has doubts regarding whether James has demonstrated that the March 4, 2015 Written Warning is an adverse employment action, the City does not raise this argument, and thus the Court assumes without deciding that it is an adverse employment action for summary judgment purposes only.

[14] The parties address whether the denial of a transfer is an adverse employment action in the context of their retaliation arguments. But due to the conflated nature of the arguments and evidence in support of James's retaliation and discrimination claims, the Court addresses this issue in the context of both sets of claims.

An "adverse employment action" must "impact[] the terms, conditions, or privileges of [the plaintiff's] job in a real and demonstrable way." *Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 920-21 (11th Cir. 2018). The impact "must at least have a tangible adverse effect on the plaintiff's employment." *Id.* at 921. To determine whether an employment action is "adverse," courts use an objective test: whether a reasonable person in the plaintiff's position would consider the employment action materially adverse. *Id.*; *Doe v. DeKalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1448-49 (11th Cir. 1998).

When a plaintiff is denied another job within the same organization, she must show that "a reasonable person faced with a choice [between the positions] . . . would prefer being transferred to [the new] position." *Jefferson*, 891 F.3d at 921 (quoting *Webb-Edwards v. Orange Cnty. Sheriff's Office*, 525 F.3d 1013, 1032 (11th Cir. 2008)). A plaintiff may satisfy this burden by presenting evidence that the new job has more prestige, improved wages, rank, or benefits, or some other serious and material change in the terms or conditions of her employment. *Id.* (finding sufficient showing of adverse employment action where new job had significantly different responsibilities and plaintiff had strong basis for preferring transfer because she was taking classes related to the new job).

Though James's *prima facie* burden is "not onerous," as the City points out, James spends a great deal of effort asserting that a failure to transfer *can* constitute

an adverse employment action without ever addressing how this one does. After the Court's examination of the record, the Court concludes that James has failed to demonstrate that a reasonable person in her position would have preferred being transferred from the Robbery unit to the Homicide unit.

As an initial matter, James has failed to identify how many alleged denials occurred or when they occurred, severely inhibiting the Court's ability to conduct the fact-specific inquiry required. Further, James testified during her deposition that the transfer involved no increase in pay, and James has offered no evidence that the transfer involved improved rank or benefits. Finally, James has offered no evidence that the transfer involved significantly different responsibilities or that she had a strong basis to prefer the transfer.

James testified that the Robbery and Homicide units are both in the Major Crimes Bureau, which is in the CID. In other words, James ultimately would have been under the same CID Command about which she complained. The only benefits of the transfer that James identified were that it is "a more challenging role" (though she did not identify in what way) and that "you get to put it on your resume," and the latter is true with any job. In short, this evidence is insufficient to show an adverse employment action.[15] *See Harrison v. Int'l Bus. Machines (IBM) Corp.*, 378

---

[15] Regardless, even if these denials constituted adverse employment actions, for the reasons stated in the Court's later discussion, James has nonetheless failed to present a valid comparator and has not shown that the reasons given for the denials were pretext.

F. App'x 950, 954 (11th Cir. 2010) (holding that plaintiff failed to show adverse employment action where denial of lateral transfers did not result in serious and material changes to terms and conditions of employment); *Webb-Edwards*, 525 F.3d at 1032-33 ("The record in this case does not demonstrate that passing over [plaintiff] resulted in a serious and material change in the terms, conditions, and privileges of employment. Her wages, benefits, or rank were not affected."). Thus, the Court addresses James's discrimination claims based on two employment actions: her 2013 suspension and her March 4, 2015 Written Warning.

### 1. *2013 Suspension*

The City argues that James's *prima facie* case fails because she cannot show a valid comparator. Because James has failed to present any evidence of a comparator outside of her own conclusory say-so, the Court agrees.

As the Eleventh Circuit recently clarified, to satisfy the fourth element of a *prima facie* case, a plaintiff "must show that she and her comparators are 'similarly situated in all material respects.'" *Lewis*, 918 F.3d at 1224. Whether a comparator is similar in "all material respects" is determined on a case-by-case basis, considering the individual circumstances in each case. *Id.* at 1227. But ordinarily, a valid comparator "will have engaged in the same basic conduct (or misconduct)," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," "will ordinarily (although not invariably) have been under the jurisdiction of the

same supervisor as the plaintiff," and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227-28.

James argues that Det. Hogan (white male) is a valid comparator with respect to her 2013 suspension. He is not. First, James and Det. Hogan did not engage in the same basic misconduct. On the one hand, James, while off-duty and outside of the police jurisdiction, used her patrol vehicle—with its emergency equipment activated—to pull in front of a school bus and stop it on its route, boarded the bus, pulled a boy off the bus, and detained him until a county deputy arrived. On the other hand, Det. Hogan used excessive force in some way against a suspect who was arrested.[16] Needless to say, while both James and Det. Hogan may have engaged in misconduct, they did not engage in the same *type* of misconduct. James's argument "essentially boils down to quibbling about whether [Hogan's] . . . alleged violations were *worse* than [her] own, not about whether they were *sufficiently similar.*" *Flowers*, 803 F.3d at 1341. But "[o]n-the-ground determinations of the severity of different types of workplace misconduct and how best to deal with them are exactly the sort of judgments about which we defer to employers." *Id.* at 1341.

---

[16] The record, including James's deposition testimony, makes clear that James does not have personal knowledge of many of the facts she attests to in her Declaration regarding Det. Hogan, and thus the Court disregards those particular facts.

Because James and Det. Hogan engaged in different types of underlying misconduct, the City also charged James and Det. Hogan with violations of different policies—James with (1) Duties of Responsible Employment (Engaging in any activity which may reflect negatively on the integrity, competency, or ability of the individual to perform his/her duty, or may reflect negatively on the Department), (2) Duty in Off Duty Arrest, and (3) Duties of Responsible Employment (Prompt and accurate reporting of all official matters)[17] and Det. Hogan with Use of Excessive Force. Further, James has presented no evidence that she and Det. Hogan were under the same supervisor at the time or shared a similar discipline history. In fact, James has offered little to no proper evidence regarding the details of the incident involving Det. Hogan. Because James has failed to demonstrate any of the hallmark characteristics of a valid comparator or any other evidence that she and Det. Hogan were similar "in all material respects," James's *prima facie* case fails.

---

[17] To the extent James claims that she did not violate this policy because she fully disclosed the details of this incident to Sgt. Hall, who failed to tell CID Command, the City has presented a legitimate, non-discriminatory reason for its action by showing that it had a good, faith reasonable belief that she did. *Winborn v. Supreme Beverage Co.*, 572 F. App'x 672, 674 (11th Cir. 2015) (recognizing that, in lieu of a comparator, a plaintiff disciplined for violation of a work rule may establish a *prima facie* case by showing that she did not actually violate the work rule, but the employer may rebut this allegation by showing that it had a good faith, reasonable belief that the plaintiff violated the rule). The City conducted an investigation, and Sgt. Hall advised that James called him but did not fully disclose the incident. That the City may have been mistaken in believing Hall's statement does not matter. When an employer honestly believed that the employee violated the policy, "the discharge is not because of race [or sex]." *Id.* Further, as discussed in the text of the opinion, James cannot show that the City's reason for her suspension is pretext for race or sex discrimination.

Nevertheless, even assuming James could establish a *prima facie* case, her claims would still fail because she has not offered sufficient evidence that the City's proffered reasons for her suspension were pretext for unlawful discrimination. James does not dispute that she did in fact stop the school bus while in her patrol vehicle, off-duty, and out of the police jurisdiction. She also does not dispute that she arrested the boy for allegedly hitting her daughter. But she does claim that Sgt. Hall falsely told Major Jurkofsky that James did not fully disclose the details of the incident, which led to her prompt and accurate reporting violation and contributed to her suspension.

Based on the record, James believed Sgt. Hall misinformed Major Jurkofsky "to keep himself from being reprimanded for not contacting the chain of command at the time," *i.e.*, not because of her race or sex. (Doc. 114-4 at 52). Regardless, even if Sgt. Hall acted out of discriminatory animus, the Mayor was the ultimate decisionmaker regarding James's suspension, and James has offered no evidence that the Mayor harbored any discriminatory animus or had anything other than an honest, good-faith belief that she committed the violations for which she was suspended.[18] The Mayor's honest belief is further bolstered by the fact that James

---

[18] James's entire claims center around the alleged discriminatory and/or retaliatory motives of Sgt. Hall, Major Jurkofsky, Sgt. Thornell, Deputy Chief Cook, Major Simmons, and/or the "CID Command" generally. But with one exception, the Mayor made the final decision to discipline James and is thus the relevant decisionmaker for purposes of her discrimination and retaliation claims. To the extent any of the other individuals were involved in James's disciplinary actions, they *at most* made recommendations regarding the appropriate disciplinary action. Claims

agreed to accept Chief Murphy's recommendation for suspension and waived her right to a hearing before the Mayor. *See generally Elrod v. Sears, Roebuck & Co.*, 939 F.3d 1466, 1470-71 (11th Cir. 1991) (explaining that plaintiff, the alleged harasser, signed without objection the paper that confirmed the sexual harassment and that plaintiff had failed to show employer's belief was not credible). James also attempts to show discriminatory animus by claiming that Major Jurkofsky told her that he would have done the same thing or worse if it had been his child, but this statement in no way indicates discriminatory animus by Major Jurkofsky—or more importantly, the Mayor—or changes the fact that James violated the policies. For these reasons, James has not presented sufficient evidence that the City's proffered reasons for her suspension were pretext for unlawful discrimination.

2. *March 4, 2015 Written Warning*

With respect to her March 4, 2015 Written Warning, James asserts only that she was discriminated against because of her race. There is no dispute that James did

---

concerning these individuals' alleged discriminatory and/or retaliatory motives almost certainly lend themselves to a "cat's paw" theory of liability, which imposes liability on the employer when the decisionmaker does not have discriminatory animus but is influenced by a supervisor who does. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011) ("[I]f a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and that act is a proximate cause of the ultimate employment action, then the employer is liable."). However, James at no point presents such an argument and thus the Court need not and does not determine whether the City is liable under a cat's paw theory. *See Caldwell v. Clayton Cnty. Sch. Dist.*, 604 F. App'x 855, 861 (11th Cir. 2015) (affirming district court's decision declining to address cat's paw theory of liability when plaintiff presented no such argument at summary judgment and reaffirming the well-settled notion that "[t]he parties, not the district court, bear the burden of formulating arguments based on the evidence").

not provide a doctor's excuse after calling in sick with less than 40 hours of accumulated sick time available. James's only contention is that she should not have been disciplined because white detectives who "called out sick far more often were never asked to provide an excuse from a doctor's office." But again, aside from this conclusory allegation, James has presented no evidence of a comparator. She has not identified these "white detectives," nor identified under what circumstances they called in sick, how much accumulated sick time they had, or whom their supervisor was at the time.  Thus, James's *prima facie* case fails.

But, even if James had established a *prima facie* case, her claim would still fail because she has not offered sufficient evidence showing that the City's reason for the disciplinary action was pretext for race discrimination. Other than conclusory allegations, which are not evidence, James points to no evidence showing that Sgt. Hudson harbored racial animus.

### B. Convincing Mosaic of Circumstantial Evidence

Even if a plaintiff is unsuccessful under the *McDonnell-Douglas* framework, the Eleventh Circuit has held that a plaintiff may still survive summary judgment if she presents a "convincing mosaic" of circumstantial evidence to create a triable issue of fact concerning the City's discriminatory intent. *Lewis*, 918 F.3d at 1220 n.6; *Flowers*, 803 F.3d at 1336 (recognizing that establishing the elements of the *McDonnell-Douglas* framework "is not, and was never intended to be, the *sine que*

*non* for a plaintiff to survive a summary judgment motion"). Aside from the evidence already addressed, James offers the following additional evidence to support her claims for discrimination: (1) that she was the only African American female in the Major Crimes Bureau, (2) that she was denied transfers from the Robbery unit to the Homicide unit and less qualified white males were selected instead, (3) that she was "nitpicked" and "scrutinized" in comparison to white officers (race only), (4) that Sgt. Thornell shouted at and treated her in a hostile manner on a near-daily basis in 2013 and made sex-based comments to her (sex only), and (5) that Deputy Chief Cook made sexual comments and gestures to her (sex only).

Perhaps the most fatal flaw in James's "convincing mosaic" theory is that she has not shown that any of these additional instances of supposed discrimination involved the decisionmakers in her 2013 suspension and March 4, 2015 Written Warning. Still, the Court addresses each of her allegations in turn.

First, that James was the only black female in the Major Crimes Bureau during her time as a Robbery detective is not enough to create a triable issue of fact regarding the City's discriminatory intent. *See Flowers*, 803 F.3d at 1338 (noting that plaintiff's only evidence touching on race was that he was first black football coach, which, without more, was insufficient to show causal connection between his race and termination).

Next, James claims that she was "repeatedly" denied transfers from the Robbery unit to the Homicide unit based on her race or sex. In addition to the obvious shortcomings that James fails to identify when these denials occurred and by whom, this allegation is unsubstantiated for a number of other reasons. James claims that a less qualified General Crimes detective, Mason Wells (white male), was selected for additional training to groom him for a position in the Homicide unit. Not only does James fail to present evidence that Det. Wells was *actually* transferred to the Homicide unit, the record makes clear that James's allegation is based on "speculation," not personal knowledge or any other evidence. (Doc. 114-4 at 12).

James also argues that the Homicide unit denied her transfer based on a false policy that she had to submit a letter of transfer through CID Command to be considered. To support this argument, she claims that four white male detectives transferred to the Homicide unit, for which the City was unable to produce letters of transfer.[19] Without more, including even the most basic identifiers of these individuals, this is nothing more than a conclusory allegation unsupported by any evidence in the record. For example, James has not shown that she was similarly situated to any of these individuals.

---

[19] James asserted this same allegation in her original Complaint, prior to discovery in this action. It is unclear from the record on what grounds she bases this assertion.

Further, James has presented no evidence of the false policy she claims prevented her from being transferred. But even if she had, James also failed to show that the City deviated from the policy because of her race or sex. *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1355-56 (11th Cir. 1999) ("Standing alone, deviation from a company policy does not demonstrate discriminatory animus."). Indeed, because James has not identified who the decisionmakers were, it is impossible to infer that these unknown decisionmakers harbored any discriminatory animus.

The only other evidence James offers to support her race discrimination claims is that she was "nitpicked" and "scrutinized" in comparison to white officers, and the only example she provides is the March 4, 2015 Written Warning, which the Court has already addressed. The only other evidence she offers to support her sex discrimination claims are the sex-based comments and gestures made by Sgt. Thornell and Deputy Chief Cook, which are equally unavailing. Even assuming James's assertions are true, these comments and actions are insufficient to withstand summary judgment because, as discussed above, James has not shown that either Sgt. Thornell or Deputy Chief Cook made the decision to suspend her in 2013 or to issue her a written warning in 2015.

### III.  Retaliation Claims

James asserts retaliation claims against the City under Title VII based on her complaints of race and sex discrimination and § 1981 based on her complaints of

race discrimination.[20] Like James's discrimination claims, these claims are analyzed under the *McDonnell-Douglas* framework. To establish a *prima facie* case of retaliation, James must show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is some causal connection between the two events. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

The parties do not dispute that James's formal EEOC Charges and the filing of this lawsuit constitute protected activity for purposes of James's *prima facie* case. But James claims that she first engaged in protected activity on January 23, 2015, when she verbally complained of race and/or sex discrimination to Deputy Chief Cook. She then claims she engaged in protected activity on March 13, 2015, when she submitted a written complaint—a 23-page letter—to Chief Finley, asserting, among other things, that the CID Command disciplines white officers in a more favorable manner than black officers. And finally, she claims she engaged in

---

[20] James asserts a retaliation claim against the City under § 1981. But it is well-established that § 1981 does not provide a cause of action against state actors, and thus § 1983 is "the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981." *Veasy v. Sheriff of Palm Beach Cnty.*, 746 F. App'x 816, 819 (11th Cir. 2018) (citing *Butts v. Cnty. of Volusia*, 222 F.3d 891, 894–95 (11th Cir. 2000)). Though James initially filed a retaliation claim under § 1983, pursuant to a Joint Stipulation of Dismissal by the parties (Doc. 116), James's retaliation claim under § 1983 has since been dismissed with prejudice. (Doc. 117). Nevertheless, the City has not raised this argument in its motion for summary judgment, and because James also brings her retaliation claims under Title VII, the Court's analysis is not affected.

protected activity when she submitted a written complaint to Director Murphy, outlining alleged instances of race and sex discrimination.

The City argues that none of these complaints constitute protected activity. Instead, the City claims James did not engage in protected activity until she filed her first EEOC Charge on May 8, 2015. The Court rejects the City's arguments. In all three instances, James voiced her concerns about race and sex discrimination to her superiors. A plaintiff "need not prove the underlying claim of discrimination which led to her protest." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997), *abrogated on other grounds*, *Lewis*, 918 F.3d at 1224-25. This is true even when evidence of the alleged underlying discrimination is "slight," as it is here. *See id.* Thus, viewing the evidence in the light most favorable to James, the Court finds that all of these instances constitute protected activity for purposes of establishing a *prima facie* case of retaliation.

The City next argues that James cannot show a causal connection between her engagement in protected activity and her adverse employment actions. To establish a causal connection, James must show that the relevant decisionmaker was "aware of the protected conduct, and that the protected activity and the adverse employment actions were not wholly unrelated." *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000), *overruled on other grounds*, *Burlington N. & Santa Fe Ry. Co v.*

*White*, 548 U.S. 53 (2006)). Temporal proximity alone may be enough to show that the protected activity and adverse employment actions were not "wholly unrelated," but the temporal proximity must be "very close." *Thomas*, 506 F.3d at 1364. For example, a three- to four-month time lapse between the events is not sufficiently close. *Id.* Because James first engaged in protected activity on January 23, 2015, her retaliation claims can necessarily be predicated only on her March 4, 2015 Written Warning, her 2015 suspension, and/or her termination.

A. <u>March 4, 2015 Written Warning</u>

Assuming for purposes of summary judgment that James's March 4, 2015 Written Warning is an adverse employment action, James *prima facie* case still fails because she has not shown that her written warning was causally related to her complaints of discrimination. James has presented no evidence, direct or circumstantial, that Sgt. Hudson knew about her verbal complaints of discrimination to Deputy Chief Cook, which is the only complaint she had made prior to receiving the written warning. According to James, at least as of February 5, 2015, Deputy Chief Cook told James that he had not contacted anyone regarding their conversation. Further, no investigation regarding James's allegations of discrimination began until March 17, 2015. And finally, Sgt. Hudson was a sergeant in the General Crimes Bureau, not the Major Crimes Bureau, and according to James, she was not reassigned to the General Crimes Bureau until the end of

February 2015. In short, James has not met her burden to show that Sgt. Hudson knew about her complaints of discrimination prior to issuing the March 4, 2015 Written Warning. *See Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1212 (11th Cir. 2013) ("[Plaintiff] has not offered any evidence to show that [the decisionmaker] was aware of any of her protected complaints, making it impossible for her to make out a prima facie case.").

B. 2015 Suspension

1. *Prima Facie Case*

Likewise, James has not shown a causal connection between her complaints of discrimination and her 2015 suspension. The City argues that James has presented no evidence that the Mayor, the relevant decisionmaker, knew about any of James's complaints of discrimination at the time he made his decision to suspend her. The Court agrees. Based on the evidence before this Court, Major Simmons made a recommendation to Chief Finley regarding James's suspension. Chief Finley then overturned Major Simmons's recommendation and made his own recommendation to the Mayor. But these were just recommendations, not final decisions. After James had a hearing before the Mayor, the Mayor made the decision on August 18, 2015, to suspend her. Because James has offered no evidence to the contrary and has not shown that the Mayor knew about her complaints of discrimination when he issued his decision to suspend her, James has failed to show a causal link, and her *prima*

*facie* case fails. *See Russaw v. Barbour Cnty. Bd. of Educ.*, 891 F. Supp. 2d 1281, 1292 (M.D. Ala. 2012) (recognizing that knowledge requirement is "common sense" because an individual "cannot have been motivated to retaliate by something unknown to him").

### 2. *Pretext*

Nevertheless, assuming *arguendo* that James has established causation for purposes of her *prima facie* case, James still cannot withstand summary judgment because she has presented insufficient evidence that the City's proffered reason for her suspension was pretext for retaliation. As evidence of retaliatory animus, James claims that (1) Sgt. Thornell handled the complaint made by Woodward's mother in an inconsistent, harsher manner than usual, (2) Sgt. Thornell encouraged or "coached" the complaint, (3) Sgt. Thornell treated her increasingly worse shortly after she met with Deputy Chief Cook, (4) she was told by the officer handling the investigation that led to her suspension that Major Simmons and Chief of Staff Jurkofsky influenced the outcome of the investigation, and (5) she was told by the investigator that CID Command "wanted the conclusion of the case to yield founded charges." All of these assertions suffer from the same insurmountable problem. Neither Sgt. Thornell, Major Simmons, nor Chief of Staff Jurkofsky made the

decision to suspend James, and thus their actions, even if James's assertions were true, [21] do not show that the Mayor acted with a retaliatory animus.

James next claims that Sgt. Thornell engaged in similar or more heated discussions with Cpl. Schnupp and that Cpl. Schnupp was not disciplined in the same manner. Cpl. Schnupp is not a valid comparator. James has offered no evidence that Cpl. Schnupp is outside of her protected class, *i.e.*, that he has not made a complaint of discrimination. And even if he were, James has not identified when any of these alleged discussions took place and has offered no evidence regarding the circumstances under which they occurred, including evidence regarding Cpl. Schnupp's discipline history, who his supervisor was at the time, whether the Mayor was aware of these discussions, or any other relevant factor.

James also argues generally that the City did not perform a thorough investigation of her complaints of discrimination, which she claims shows retaliatory animus. She points to the fact that Martinez, who conducted the investigation, did not interview multiple individuals she identified in her complaints. But a closer look at the record reveals that James lacks personal knowledge concerning the details of

---

[21] Notwithstanding the fact that the Mayor is the relevant decisionmaker for purposes of the Court's analysis, the first two allegations are conclusory and unsubstantiated by the record, and any inference of retaliatory motive by Sgt. Thornell with respect to the third allegation is irrelevant to the Court's analysis and dispelled by James's own declaration. As for the fourth and fifth allegations, James does not assert how, why, or in what way Major Simmons and Chief of Staff Jurkofsky influenced the investigation, and she fails to identify to whom she is referring in the "CID Command." Either way, these actions alone are not suspicious and still do not show a retaliatory motive by the Mayor.

Martinez's investigation, including the people who were interviewed. Still, even if Martinez's investigation was weak, James does not present evidence that it was weak due to a retaliatory animus harbored by Martinez or, more importantly, the Mayor. *See Pinney v. S. Nuclear Operating Co.*, No. 1:09-cv-235, 2011 WL 1215808, at *11 (M.D. Ala. Mar. 31, 2011) (finding that allegation that investigation could have been more thorough did not establish gender discrimination). In fact, there is no evidence that the Mayor even knew about the investigation as he did not know about James's complaints of discrimination.

The only additional evidence James offers is that she was denied a transfer from the Robbery unit to the Homicide unit. As with her discrimination claims, James does not identify when, by whom, or under what circumstances she was denied the transfer, nor does she present evidence of a comparator who did not make a complaint of discrimination and was treated more favorably. Because James has presented no evidence regarding who made the decision to deny her transfer, this purported evidence in no way creates an inference of retaliation.

C. 2017 Termination

The City concedes that the Mayor knew about James's lawsuit filed on August 4, 2017, when he made the decision to terminate James on November 21, 2017.[22]

---

[22] Though James filed a second EEOC Charge on November 2015, James was not terminated until November 2017. Without more, which James has not presented, this significant two-year lapse in time is insufficient evidence of causation. In addition, James was promoted to Sergeant after the

But without more, a three-month lapse in time between the filing of the lawsuit and the Mayor's termination decision is insufficient to show a causal connection, and James has presented no other evidence indicating that the Mayor was motivated by retaliatory animus. *See, e.g.*, *Thomas*, 506 F.3d at 1364.

When timing is the only basis for a retaliation claim and the allegedly retaliatory adverse employment action was "the ultimate product, of 'an extensive period of progressive discipline,'" which began long prior to the plaintiff's protected activity, "an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *see also Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008) ("Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."); *Ducksworth v. Strayer Univ. Inc.*, No. 2:16-cv-01234, 2019 WL 1897278, at *17 (N.D. Ala. Apr. 29, 2019) (stating that when "gradual adverse actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise" (quoting *Slattery*, 248 F.3d at 95)); *Jackson v. City of Homewood, Ala.*, No. 1:13-cv-737, 2015 WL 5011230, at *9 (N.D. Ala. Aug. 24, 2015) (citing *Slattery* for a similar proposition).

---

filing of her second EEOC Charge. The "Certificate Note" in the City's records notes that it was approved by the Mayor, diluting any inference that James's termination was predicated on retaliation based on her complaints of discrimination in 2015.

Here, James had an extensive history of disciplinary actions, including for insubordination and disrespectful behavior, that began long before James filed this lawsuit. As a result, prior to filing this lawsuit and prior to sending her September 27, 2017 email, James was already at the last step before termination under the City's progressive discipline policy. When James sent the September 27, 2017 email that led to her termination, the City's unrefuted evidence shows that it took steps to ensure that it disciplined James in the same manner as others who were disciplined for the same violation. This suggests the opposite of a retaliatory motive.

Specifically, after Major Youngblood reviewed James's email and determined that it violated departmental policy, he sought advice from the Legal Department and reviewed another detective's disciplinary action for the same violation. Given the similar nature of the offenses, James's violation was categorized in the same manner as the other detective's—as a Category B violation. It is unclear what more the City could have done to treat James fairly in this circumstance. Based on James's prior discipline history, she was already at Step 4 under the City's progressive discipline policy and thus was terminated. *See July v. Bd. of Water & Sewer Comm'rs*, No. 11-cv-635, 2012 WL 5966637, at *11 (S.D. Ala. Nov. 29, 2012) ("In formulating disciplinary action, an employer is not bound to consider a particular misdeed in isolation, without the guidance and context of the employee's prior disciplinary history.").

Because James has failed to show that the Mayor acted with a retaliatory motive and that her termination was anything more than the culmination of her extensive, and often egregious, discipline history, James's retaliation claims fail.

## CONCLUSION

Based on the foregoing reasons, the City's Motion for Summary Judgment (Doc. 114) is due to be **GRANTED**.

A final judgment will be entered separately.

**DONE** and **ORDERED** this 25th day of July 2019.


_____/s/ Andrew L. Brasher_____
ANDREW L. BRASHER
UNITED STATES DISTRICT JUDGE